In re BIELENBERG'S ESTATE. HIGGINS et al., RE-
SPONDENTS, v. BIELENBERG et al., APPELLANTS.

(No. 6,498.)

(Submitted January 6, 1930. Decided February 1, 1930.)

[284 Pac. 546.]

*Messrs. Loble & Adair* and *Mr. C. E. Pew,* for Appellants, submitted an original and a reply brief; *Mr. Lester H. Loble* and *Mr. Pew* argued the cause orally.

*Messrs. W. E.* and *E. M. Kelley* and *Messrs. Murphy & Whitlock,* for Respondents.

MR. JUSTICE GALEN delivered the opinion of the court.

This is an appeal from a judgment denying probate of the will of Nicholas J. Bielenberg, deceased. There is no question raised as to the sufficiency of the pleadings.

The will in question bears date December 30, 1924, and the grounds of contest alleged are: (a) Mental incompetency; (b) undue influence; and (c) improper execution. Upon issues joined, the case was regularly tried before a jury, which, in answer to special interrogatories submitted to it, found the

testator to have been mentally incompetent to execute the will, in accordance with which finding judgment was entered.

The proof failed to show any irregularity in the execution of the will, and therefore that issue was not submitted to the jury. There was no finding on the issue of undue influence, as the court very properly instructed the jury that it would not be required to make determination of that question, if the testator was found to have been mentally incompetent to make the will.

Of the specifications of error assigned by the proponents of the will, all of which have been given careful consideration, we have concluded, in disposition of this appeal, that the only question to be determined is whether the evidence is sufficient to support the finding of the jury.

The testator resided in the city of Deer Lodge, where he died, and had made that locality his home for a period of more than forty years. He was a Montana pioneer of stalwart, honest and energetic type, and prior to the year 1918 was very successful, and generally recognized as a man of more than usual business ability. He was very devoted to his wife, and, after her death in 1918, began to show failure, both physical and mental, with marked continued degeneration until his death at his home in Deer Lodge on July 6, 1927, at the age of eighty years. Many of his business associates and intimate friends of long years of continued acquaintance with him testified as to his noticeable decline subsequent to the death of his wife, and the accentuation thereof with the lapse of years until the time of his death. He seemed to have no recollection of recent events, was greatly bewildered, failed to recognize old friends, near relatives and intimate acquaintances on the street or elsewhere, although in many instances he had had recent contacts with them. Although, as stated, for many years a resident of Deer Lodge, and very familiar therewith, he would become lost on the streets of the city, could not find his own home in which he had for years resided, and did not recognize other places in the city with which he had been long familiar. He did not recognize his own prop-

erty, and asserted claim to property in which he had never had any interest. From the year 1922 until his death he appeared to be mentally incompetent and unable to transact ordinary business.

Alma Higgins, a daughter of the testator, one of the contestants herein, testified that after the year 1918 her father lost all interest in business affairs, and that in 1923 his mental condition was such that he was unable to testify as a witness in a contest over the will of his brother, John Bielenberg; that, when he visited a mine with which he was previously familiar and in which he was greatly interested, he did not know where he was, and did not realize that his own son, who had accompanied him to the mine, was there; that at the time the will was executed in the office of Charles R. Leonard, an attorney of highest standing, in the city of Butte, she accompanied the testator, who did not seem to appreciate what he was doing, and a few minutes after having executed the will, after leaving Mr. Leonard's office, she stated to him, "I am going to make out a will, I think it is a sensible thing to do," to which he replied, "I have never made out a will in my life." She then said to him, "Why, Dad, you just signed your will a few minutes ago," and he answered, "Oh, yes, that is right."

During the last illness of his brother Charlie at Deer Lodge in the months of September and October, 1924, the testator made daily calls to see his brother, who died on October 31, 1924, and whose funeral he attended; notwithstanding, a few days after the funeral he called at his brother's house, as usual, and inquired of his niece, "How is Charlie this morning?"

H. J. Toomey, a lifelong friend and former business associate of the testator, who frequently saw and conversed with the latter during the last few years of his life, made a very intelligent, forceful and convincing witness. He stated that in partnership business dealings with the testator prior to 1896 they had jointly owned as many as 160,000 sheep at one time, and that up to the year 1918 the testator was a shrewd busi-

ness man.  As to experiences with and observations made of the testator in later years, he stated that the deceased "was. utterly incompetent to transact business of any kind, no matter what it might be, from 1920 on."  The witness testified that "in 1920 I met him on the street and he did not know me at all.  His condition was terrible, both mentally and physically.  I said to him, 'How do you do?'  He looked at me and said, 'I don't know you; I never seen you.'  I said, 'Is that possible?' and he said, 'Yes.'  He asked me what my name was and I told him.  He put his hand on my shoulder and said, 'What is the matter with me, Joe?'  I said, 'You are all right, and straighten up.'  I saw then that his mind was completely gone and that he was a wreck physically and mentally.  I saw him many times before that and it was always the same way.  I went to Oregon, and was gone three or four months and came back at the time of the Johnny Bielenberg trial, and he was the same way at that time.  This Johnny Bielenberg trial was in 1923, and I was a witness in that proceeding and conceded to be an important witness.  I was well acquainted with these people at all times and mixed up in their line of business.  I saw Nick Bielenberg every day during the John Bielenberg will contest, and his mental condition at that time was pitiful.  He did not know a thing in the world.  He was in no condition, as far as any business matters of that kind were concerned, to take care of anything.  He was utterly incapable of doing anything of that kind.  He was not called as a witness in the John Bielenberg trial."

Many other witnesses testified to like effect.  A detailed review of such evidence would only extend this opinion without useful purpose.

Dr. John M. Scanland, a qualified expert in mental and nervous diseases, who knew the testator intimately from May, 1899, until his death, in answer to a hypothetical question, stated that the testator was of unsound mind when the will was executed, that he was afflicted with senile dementia, which is a progressive disease terminating in death.  He also testified

respecting his personal observations of the testator's gradual decline in mentality from the year 1922 until his death.

The only other physician called as a witness in the case was Dr. G. J. Marquette, who appeared for the proponents of the will. He did not qualify as an expert on mental diseases, but had attended the testator in his lifetime and during his last illness. He testified: "Q. I will ask you to state whether or not during the year, say back as far as 1924, in your opinion and from your observation, he was of sound or unsound mind? A. If you mean by unsound mind 'insane,' I would answer that as before; he was not insane. He was not mentally perfect, of course. There was a mental impairment as a result of the usual processes of old age. * * * I would say he was not capable of taking care of active business affairs."

Without objection, the jury was correctly instructed that one of the issues to be determined was whether or not the testator was competent to execute the will in question, and that "incompetency when applied to an individual's incapacity to make a will applies to any person who, whether insane or not, is, by reason of old age, disease, weakness of mind from any other cause, unable to understand what property he has, the relationship that he bears to those who would naturally be the objects of his bounty, and what disposition he may be making of his property at the time. A person may be mentally incompetent to make a will and yet not be an insane person"; and further that, if from a preponderance of the evidence it entertained the belief that the testator "was not able to understand and carry in mind the nature and situation of his property and his relation to his relatives and those around him with clear remembrance as to those in whom and those things in which he has been mostly interested, or was not capable of understanding the act he was doing and the relation in which he stood to the objects of his bounty, or was suffering from any delusion or the effect of disease which led him to dispose of his property otherwise than he would if he knew and understood what he was doing, then you will find that he was at the time mentally incompetent to make a will."

"Every person over the age of eighteen years, of sound mind, may, by last will, dispose of all his estate, real and personal." (Sec. 6974, Rev. Codes 1921.) But a will may be contested because of the incompetency of the decedent. (Id., sec. 10032.) In this case, the issue raised and determined was whether the testator was mentally competent at the time he signed the instrument claimed by the proponents to be his last will and testament.

"Competent" means capable, qualified or fit (Webster's New International Dictionary); possessing legal power or capacity (*United States* v. *Sischo*, (D. C. Wash.) 262 Fed. 1001). And a testator is competent if he is possessed of the mental capacity to understand the nature of the act, to understand and recollect the nature and situation of his property and his relations to persons having claims on his bounty whose interests are affected by his will. (*In re Smith's Estate*, 200 Cal. 152, 252 Pac. 325.) The "testator must have sufficient strength and clearness of mind and memory to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and nature of the act which he is about to perform, and the names and identity of the persons who are to be objects of his bounty, and his relation towards them." (Page on Wills, 2d ed., sec. 141.)

When applied to the capacity required to make a valid will, the word "incompetent" should be construed to apply to any person, whether sane or insane, who is by reason of old age, disease, weakness of mind, or other cause, unable to understand what property he has, the relationship which he bears to those who would naturally be the objects of his bounty, and the disposition of his property he may at the time be making. (*In re Carroll's Estate*, 59 Mont. 403, 196 Pac. 996.)

The record is very voluminous, and, as to the testamentary capacity of the deceased, the evidence is in conflict; however, there is an abundance of testimony in support of the finding of the jury.

The finding of the jury is in accordance with the law, and, since there was conflict in the evidence, it will not be dis-

turbed on appeal. Question as to the weight of the evidence addressed itself to the jury, and our province is merely to determine whether substantial evidence exists to support the verdict. (*In re Carroll's Estate*, supra.) It is not within our province to substitute our judgment for that of the trial jury, who heard and saw the witnesses. (*In re Carroll's Estate*, supra.)

It is noted that the district court allowed, as proper costs and charges against the estate, fixed attorneys' fees to both the attorneys for the contestants and the contestees, and that no objection has been made thereto, by any of the parties. Admittedly, the contest of the will was defended in good faith. Consequently the only costs or attorneys' fees necessary to be further considered and fixed are those incurred on this appeal. The district court, as well as this court, is clothed with authority, in its discretion, to order the payment of costs out of the assets of an estate upon the bona fide contest of a will. (Sec. 10372, Rev. Codes 1921.) And we have heretofore held that reasonable attorneys' fees are proper charges against an estate as costs, where the contest of a will is initiated and defended in good faith. (*In re Williams' Estate*, 55 Mont. 63, 1 A. L. R. 1639, 173 Pac. 790; *In re Carroll's Estate*, supra.) Under such authority, believing that we are in better position than the district court to fix and determine a reasonable allowance for attorneys' fees as costs on this appeal, and in order to set that question at rest, we have determined, and it is hereby ordered, that all costs of this appeal shall be chargeable to the estate of the deceased and paid from its assets, including the sum of $1,000, hereby fixed and allowed as a reasonable attorneys' fee to be paid to the attorneys for the contestants, and the further sum of $2,000, hereby fixed as a reasonable attorneys' fee to be paid to the attorneys for the proponents of the will. The judgment is affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MATTHEWS, FORD and ANGSTMAN concur.

Rehearing denied February 17, 1930,